1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD AND HELEN TJADEN, husband and wife; RICHARD AND HELEN TJADEN as trustees for the RICHARD AND HELEN TJADEN FAMILY TRUST,<br><br>                              Plaintiffs,<br><br>      vs.<br><br>H.S.B.C. BANK USA NATIONAL ASSOCIATION, individually and as TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE OPTEUM MORTGAGE ACCEPTANCE CORPORATION, ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-4 TRUST FUND; EVERBANK FINANCIAL CORP., dba EVERBANK; and MTC FINANCIAL INC., a corporation dba TRUSTEE CORPS.,<br><br>                              Defendants. | CASE NO. 13-cv-3173 JM (DBH)<br><br>ORDER DISMISSING PLAINTIFFS' SECOND AMENDED COMPLAINT WITHOUT LEAVE TO AMEND |

11
12
13
14
15
16
17
18
19
20
21
22

23      This order addresses Defendants' motions to dismiss the second amended

24  complaint, (Doc. Nos. 30 & 32), and their related requests for judicial notice,

25  (Doc. Nos. 30-3 & 32-2). The motions were fully briefed and were found suitable

26  for resolution without oral argument pursuant to Civil Local Rule 7.1.d.1. For the

27  reasons set forth below, the court dismisses the second amended complaint without

28  leave to amend.

13cv3173

1

**BACKGROUND**

2      In this case, Plaintiffs assert that Defendants are not entitled to collect

3   payment or foreclose because Plaintiffs' mortgage note was assigned to a trust that

4   was void under New York law.  Defendants are HSBC Bank USA ("HSBC"),[1] the

5   trustee of the trust; EverBank;[2] and MTC Financial, Inc. ("MTC"), doing business

6   as Trustee Corps.  Plaintiffs' allegations in the second amended complaint ("SAC"),

7   (Doc. No. 28), the attached exhibits, (Doc. No. 28-1), and the publicly recorded

8   documents the court took judicial notice of in its order dismissing the previous

9   complaint, unopposed by Plaintiffs, (Doc. No. 27 at 2 n.3),[3] provide the following

10  account:[4]

11     In 2004, the Opteum Mortgage Acceptance Corporation ("OMAC") Asset-

12  Backed Pass-Through Certificates Series 2005-4 Trust ("the trust") was organized,

13  with HSBC as trustee.  (SAC ¶ 6.)  The trust agreements, including the pooling

14  and service agreement, required all pooled notes and mortgages to be transferred

15  to HSBC within thirty days of the closing date of the trust, which was in August

16  2005.  (Id. ¶ 9.)  An SEC Form 8-K filed by the trust in September 2005 reported

17  that the original principal balance of the loans in the trust totaled 1.3 billion dollars.

18  (Id. ¶ 10.)  Plaintiffs claim that the trust was

19          an illegal purpose trust having been formed and purposed to deceive
20          investors that the investments were secured in accordance with federal
             law by 4,870 residential mortgage notes and mortgages when it was in

21

22     [1]  HSBC states that it was erroneously sued as "H.S.B.C. Bank USA National
23  Association, Individually and as Trustee for the Certificate Holders of the Opteum
    Mortgage Acceptance Corporation, Asset-Backed Pass-Through Certificates, Series
    2005-4 Trust Fund."  (Doc. No. 32 at 2.)

24
25     [2]  EverBank states that it was erroneously sued as "EverBank Financial Corp.
    dba EverBank."  (Doc. No. 32 at 2.)

26     [3]  The documents are attached to MTC's previous request for judicial notice,
27  (Doc. No. 12, Exhs. A–J).  They are cited here as "RJN, Exh. #."

28     [4]  Plaintiffs' allegations are taken as true to the extent that they are well
    pleaded.

1
2
3
4

fact vested with no residential mortgage property by conveyance or transfer or otherwise rendering H.S.B.C. as trustee having no holder status under New York commercial law to cure and/or ratify non-conforming defects arising in the securitization process.  It was also formed and purposed to deceive homeowners that their loans were part of the trust estate holdings authorizing its trustee and servicing agents to collect payments from them.

(Id. ¶ 30 (footnote omitted).)  In fact, Plaintiffs claim, none of the loans identified by the 8-K had actually been conveyed or transferred to the trust as required by the trust agreements.  (Id. ¶ 34.)  Instead, they were scanned into a database maintained by Mortgage Electronic Registration Systems, while the original notes were shredded or warehoused elsewhere.  (Id.)

In May 2005, Plaintiffs obtained a loan for $548,000 secured by a deed of trust on their property located at 1930 Alta Vista Drive in Vista, California.  (Id. ¶ 11; RJN, Exh. A.)  The lender was Provident Savings Bank, F.S.B. ("Provident"); the trustee was Provident Financial Corp. ("Provident Financial"); and the beneficiary was Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for the lender and the lender's successors and assigns.  (RJN, Exh. A.)  The deed of trust was recorded on May 9, 2005.  (Id.)

The deed of trust contains a choice-of-law provision, which provides:  "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located."  (Id. at 11.)  It also states:  "This Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower."  (Id.)  It further provides that a sale of an interest in the note may not result in a change of loan servicer, that a change in loan servicer may not be related to a sale of the note, and that the borrower will be notified of any change in servicer and given the address to which payments should be sent.  (Id.)

According to Plaintiffs, Provident originated Plaintiffs' loan with the intent of turning a profit.  (SAC ¶ 22.)  Almost immediately after originating the loan, Provident assigned Plaintiffs' loan to the trust "for the immediate return in full

1  of the sum loaned plus margin profit."  (Id. ¶ 21.)

2  Provident was the servicer of the loan from the origination date until

3  August 1, 2005, when Opteum Financial Services, LLC ("Opteum") became the

4  servicer.  (Id. ¶ 27.)  Plaintiffs were notified of the change in two notices, dated

5  June 21 and July 6, 2005, respectively.  (Id.)  Opteum remained the servicer until

6  June 1, 2007, when Everhome Mortgage Company ("Everhome") became the

7  servicer.  (Id. ¶ 28.)  Plaintiffs received notice of this change in a notice dated

8  May 10, 2007.  (Id.)

9  On February 3, 2009, MERS purported to assign its interest to HSBC.

10  (Id. ¶ 29; RJN, Exh. C.)  The assignment was signed by Christina Allen, who

11  signed as "VP" of MERS.  (Id. ¶ 29; RJN, Exh. C.)  Also on February 3, 2009,

12  HSBC substituted Regional Service Corporation ("Regional") as trustee in place of

13  Provident Financial.  (RJN, Exh. D.)  Both documents were recorded on May 11,

14  2009.  (RJN, Exhs. C & D.)  Plaintiffs claim that the assignment by MERS to HSBC

15  was forged because Christina Allen was a robo-signer who was an employee of

16  Lender Processing Services, not MERS.  (SAC ¶ 29.)

17  On February 4, 2009, Regional issued a notice of default and election to

18  sell on behalf of Everhome, which was a subdivision of EverBank.  (Id. ¶ 61; RJN,

19  Exh. B.)  The notice, which was recorded on February 5, 2009, stated that Plaintiffs

20  were in arrears $24,510 at the time.  (RJN, Exh. B.)  Three months later, on May 6,

21  2009, Regional, acting on behalf of HSBC and EverBank, issued a notice of

22  trustee's sale.  (SAC ¶ 61; RJN, Exh. E.)  The notice was recorded on May 11,

23  2009, (RJN, Exh. E), the same day the February 3, 2009 assignment by MERS to

24  HSBC and the substitution of Regional for Provident Financial were recorded.

25  Beginning on May 11, 2009, and continuing to the time they initiated this

26  action, Plaintiffs applied for loan assistance.  (SAC ¶ 44.)  On August 3, 2010,

27  MTC, as agent for HSBC, issued another notice of default and election to sell,

28  which was recorded on August 9, 2010.  (SAC ¶ 43; RJN, Exh. F.)  Meanwhile,

Plaintiffs claim, Defendants did not respond to their requests for validation of the debt and pressed for foreclosure, having calculated that foreclosure would be more profitable than modifying Plaintiffs' loan. (SAC ¶¶ 44–45.)  Ultimately, Plaintiffs were coerced into paying $32,129 and signing loan-modification documents with EverBank, which was acting in conjunction with MTC. (Id. ¶ 45.)  After Plaintiffs agreed to the modification, on December 16, 2010, MTC rescinded the notice of default and election to sell and recorded the rescission on December 20, 2010. (Id. ¶ 45; RJN, Exh. G.)  In the rescission, MTC identified itself as "Trustee or acting agent for Beneficiary." (Id. ¶ 45; RJN, Exh. G.)  All the while, Plaintiffs assert, "Regional remained the duly recorded substituted trustee for Provident, the original trustee." (SAC ¶ 45.)

On July 22, 2013, HSBC assigned its interest to EverBank. (Id. ¶ 62; RJN, Exh. H.)  The assignment was recorded on July 31, 2013. (RJN, Exh. H.)  On July 29, 2013, EverBank, as successor by merger to Everhome, substituted MTC as trustee of the loan. (SAC ¶ 46; RJN, Exh. I.)  The substitution was recorded on August 6, 2013. (RJN, Exh. I.)  On July 31, 2013, EverBank became the servicer of Plaintiffs' loan. (SAC ¶ 28.)

On August 5, 2013, MTC issued a notice of default and election to sell. (RJN, Exh. J.)  The notice, which was recorded on August 6, 2014, indicates that Plaintiffs were in arrears $91,735. (Id.)

Meanwhile, on July 22 and August 8, 2013, Plaintiffs sent letters to Defendants asking them "to validate their legal status as the owners, holders, or representatives of the owners or holders of Plaintiffs' loan." (SAC ¶ 65 & Exhs. 10 & 11.)

On July 30, 2013, EverBank responded to Plaintiffs' letters, stating: "We are researching the inquiry and you will receive a reply shortly." (SAC ¶ 66.)  HSBC's Mortgage Service Center also responded that day, stating:  "This property cannot be located in the portfolio of loans we are servicing." (Id. ¶ 66 & Exh. 12.)

On August 8 and August 14, 2013, MTC responded:  "Requests for debt validation must be sent to the lender. . . .  Accordingly, please address future correspondence to the appropriate parties rather than Trustee Corps. (MTC)."  (SAC ¶ 66.)

On September 6, 2013, Plaintiffs mailed a letter to EverBank, captioned as a "QUALIFIED WRITTEN REQUEST."  (SAC ¶ 66 & Exh. 13.)  The letter requested nearly 30 types of information regarding the identity of the "current holder and owner of the original mortgage note."  (SAC, Exh. 13 at 1.)

On September 17, 19, and 24, 2013, EverBank responded, stating:  "Everhome services the loan on behalf of the loan's investor, Wells Fargo Bank."  (SAC ¶ 66.)  Plaintiffs claim that this statement was fraudulent and misleading because EverBank was "dissembling . . . their loan servicing for H.S.B.C. as trustee for the sham, illegal purposed OMAC Trust."[5]  (Id.)  The letter continued:  "Regarding your general and specific requests for multiple items regarding this loan, be advised that for some of the information you requested, Everhome does not make available to the public nor does it directly relate to the loan."  (Id.)

At some point, Plaintiffs petitioned for bankruptcy.  (Id. ¶ 47.)  On December 10, 2013, EverBank filed a declaration in Plaintiffs' bankruptcy case "purporting to show lawful right of beneficial title to Plaintiffs' mortgage note and deed of trust."  (Id.)  At that point, the bankruptcy stay was lifted as to EverBank so that it could proceed with foreclosure.  (Id.)

Plaintiffs, who are represented by counsel, initiated this action in December 2013, but did not serve Defendants at that time.  (Doc. No. 1.)  After months of inaction, the court notified Plaintiffs of possible dismissal for failure to prosecute.  (Doc. No. 3.)  Plaintiffs requested additional time to effect service, claiming that additional time was needed to permit negotiations with EverBank.  (Doc. No. 5.)

---

[5] The court notes that this assertion appears to be inconsistent with Plaintiffs' assertion that HSBC assigned its interest to EverBank on July 22, 2013. (SAC ¶ 62.)  Neither fact is central to the court's disposition of this case.

1   The court granted the extension and required Plaintiffs to serve Defendants by

2   July 11, 2014.  (Doc. Nos. 6 & 7.)  Plaintiffs then filed a first amended complaint

3   ("FAC") and finally served Defendants.  (Doc. Nos. 8–10.)

4        MTC moved to dismiss the FAC in August 2014, and EverBank and HSBC

5   did the same in September 2014.  (Doc. Nos. 11 & 20.)  In December 2014, the

6   court granted the motions, dismissing the FAC.  (Doc. No. 27.)  In doing so, the

7   court explained that borrowers do not have standing to challenge assignments that

8   are alleged to be defective because of robo-signing, and they also do not have

9   standing to challenge the transfer of their note to a trust in violation of the trust's

10  pooling and service agreement.  (Id. at 7–9.)  The court identified further flaws

11  that required dismissal of Plaintiffs' federal claims, and it declined to exercise

12  supplemental jurisdiction over the remaining state-law claims because Plaintiffs had

13  not alleged a basis for diversity jurisdiction.  The court granted Plaintiffs' request

14  for leave to amend.  (Id. at 15.)

15       Plaintiffs filed the operative second amended complaint on December 17,

16  2014.  (Doc. No. 28.)  Plaintiffs summarize their case as follows:

17      Plaintiffs allege on information and belief for gravamen against the
    Defendants the collection of an unlawful debt purportedly owing to the
18  the **OMAC TRUST** that had been unlawfully formed and illegally
    purposed, devoid at its inception ('cut off date') on August 1, 2005,
19  of the transfer of most if not all (4870 of them) trust mortgage assets
    in violation of New York and Federal laws.  The trust was ***void ab***
20  ***initio*** (not ***voidable***) because neither Plaintiffs' mortgage loan, nor
    most or all other mortgage loans as required by law, had been conveyed
21  to, or held by the trust, all to the knowledge of the trust sponsor
    (Opteum), the trust master servicer (Wells Fargo), the trust special
22  servicers (Opteum, Everhome and EverBank), the trustee (H.S.B.C.)
    and the custodian (J. P. Morgan Trust) such that the **OMAC Trust**
23  (1) had no lawful existence much less any lawful right to collect
    Plaintiffs' loan obligation, (2) such that Defendants are by their
24  fraudulent conduct equitably estopped from asserting limitations
    defenses, and (4) such that the debt, that Defendants seek to collect
25  against the Plaintiffs, is unlawful within the meaning of **18 U.S.C.**
    **§1962 (c)** and otherwise as follows . . . .

26

27  (Id. at 1.)

28  ///

1    Plaintiffs claim that, as a "direct and proximate result" of Defendants'

2    illegal collection efforts, they have suffered $575,000 in damages, including

3    $190,000 in payments; $25,000 in servicing and foreclosure fees; $175,000 in

4    loss of access to credit and increased costs of credit; $20,000 in taxes related to the

5    forced sale of their property; $40,000 in lost business income because of time spent

6    defending; $25,000 in costs and fees; and $100,000 in lost good will in their

7    business.  (Id. ¶¶ 53, 81.)

8    Based on these allegations, Plaintiffs assert thirteen causes of action:

9    (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

10   18 U.S.C. § 1692 et seq.; (2) negligence; (3) quasi-contract; (4) violation of the

11   Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 et seq.; (5) deceptive

12   and misleading debt-collection practices, in violation of the Fair Debt Collection

13   Practices Act, 15 U.S.C. § 1692 et seq.; (6) unfair competition under California

14   Business & Professions Code § 17200 et seq.; (7) accounting; (8) equitable relief,

15   including cancellation, reconveyance, constructive trust, and quiet title; (9) civil

16   extortion under state and federal law; (10) violation of California Civil Code

17   § 2924.17; (11) injunctive relief under California Civil Code § 2923.5;

18   (12) negligent infliction of emotional distress; and (13) injunctive relief against

19   threatened default and foreclosure.  (SAC ¶¶ 48–142.)

20   Plaintiffs seek general, special, and punitive damages, including the

21   $575,000 in damages, which they contend should be trebled pursuant to their RICO

22   claim, as well as rescission, reformation, restitution, injunctive relief, and fees and

23   costs.  (Id. at 75–76.)

24   On January 7, 2015, MTC filed the instant motion to dismiss the SAC and

25   a related request for judicial notice.  (Doc. Nos. 30 & 30-3.)  Everbank and HSBC

26   did the same on January 14, 2015.  (Doc. Nos. 32 & 32-2.)  Plaintiffs opposed the

27   motions in a single memorandum filed on February 9, 2015, (Doc. No. 33), and

28   Defendants replied on February 13, 2015, (Doc. Nos. 35 & 36.)

13cv3173

**DISCUSSION**

**A.    Requests for Judicial Notice**

Defendants ask the court to take judicial notice of the ten publicly filed documents the court took notice of previously, as well as the court's previous order dismissing the FAC.  (Doc. Nos. 30-3 & 32-2.)  There is no need for the court to take judicial notice of its own order or of documents that are already judicially known.  Defendants' requests for judicial notice are, therefore, denied as moot.

**B.    Motions to Dismiss**

**1.    Legal Standards**

For a plaintiff to overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  The court "must take all of the factual allegations in the complaint as true," but is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Id.</u> (internal quotation marks omitted).  Factual pleadings merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible.  <u>See id.</u> at 678–79.  The court should grant 12(b)(6) relief if the complaint lacks either a cognizable legal theory or facts sufficient to support a cognizable legal theory.  <u>See</u> <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990).

When addressing a Rule 12(b)(6) motion, courts generally may not consider materials outside the pleadings.  <u>See</u> <u>Schneider v. Cal. Dep't of Corrs.</u>, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); <u>Jacobellis v. State Farm Fire & Cas. Co.</u>, 120 F.3d 171, 172 (9th Cir. 1997); <u>Allarcom Pay Television Ltd. v. Gen. Instrument Corp.</u>, 69 F.3d 381, 385 (9th Cir. 1995).  "The focus of any Rule 12(b)(6) dismissal . . . is

the complaint." <u>Schneider</u>, 151 F.3d at 1197 n.1.  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).

Federal Rule of Civil Procedure 15 provides that leave to amend should be granted when justice requires it.  Accordingly, when a court dismisses a complaint for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992) (internal quotation marks omitted).  Amendment may be denied, however, if amendment would be futile.  <u>See</u> <u>id.</u>

## 2.   Plaintiffs' Federal Causes of Action

Plaintiffs' federal causes of action are for (1) racketeering; (2) violation of the Real Estate Settlement Procedures Act; (3) violation of the Fair Debt Collection Practices Act; (4) extortion; and (5) injunctive relief.  The court takes each of them in turn.

### i.   Racketeering

Plaintiffs' primary claim is that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by conspiring to collect an unlawful debt.  (SAC ¶¶ 48–82.)  They assert that the racket included the formation and operation of the trust, and that Defendants engaged in mail fraud, wire fraud, forgery, and money laundering in the course of their efforts "to collect an unlawful debt."  (<u>Id.</u> ¶ 55.)  Specifically, Plaintiffs allege that Defendants mailed false monthly collection statements; recorded false assignments and notices of default, foreclosure, and trustee's sale; falsely reported Plaintiffs' late payments and default to credit agencies; sent correspondence designed to conceal that they had no legal right to collect; attempted to collect illegal fees and penalties; coordinated the

1  forged assignment by MERS to HSBC; and falsely represented their standing as

2  owners or representatives of the true owner or holder of the rights to Plaintiffs' loan.

3  (Id. ¶¶ 58–70.)  Plaintiffs appear to assert a claim for conspiracy under § 1962(d),

4  although they cite only § 1962(c).

5       A civil RICO claim "requires allegations of the conduct of an enterprise

6  through a pattern of racketeering activity that proximately caused injury to the

7  plaintiff." Swartz v. KPMG LLP, 476 F.3d 756, 760–61 (9th Cir. 2007).  A claim

8  under § 1962(c) requires "a pattern of racketeering activity or collection of unlawful

9  debt."[6]  A claim under § 1962(d) requires facts showing a conspiracy to violate one

10  of the other substantive provisions of § 1962.[7]

11       Both sets of Defendants contend that this claim fails.  Among other things,

12  they argue that Plaintiffs do not have standing to challenge any irregularities in the

13  securitization or assignment of their deed of trust because they were not parties to

14  the assignment and they have not pleaded that they suffered any damages because

15  of it.  (Doc. No. 30-2 at 10–18; Doc. No. 32-1 at 6–7.)  Both motions quote the

16  same portion of Rivac v. Ndex West, LLC, 2013 WL 3476659 (N.D. Cal. 2013),

17  which dismissed a similar RICO claim, stating:

18       First, "securitization" of a loan (as plaintiffs define it) is not a
         racketeering activity, and is not "criminal or punishable as a crime."
19       In addition, *because the alleged damages arise from plaintiffs' conduct*
         *(failure to stay current on their loan payments), rather than from any*
20       *action by defendants, plaintiffs cannot state a viable RICO claim.*
         The dismissal of the RICO claim is with prejudice.
21

22  Id. at *8 (citation omitted and emphasis added).

23  _____

24       [6]  18 U.S.C. § 1962(c) reads:

25       It shall be unlawful for any person employed by or associated with
         any enterprise engaged in, or the activities of which affect, interstate
26       or foreign commerce, to conduct or participate, directly or indirectly,
         in the conduct of such enterprise's affairs through a pattern of
27       racketeering activity or collection of unlawful debt.

28       [7]  18 U.S.C. § 1962(d) reads:  "It shall be unlawful for any person to conspire
     to violate any of the provisions of subsection (a), (b), or (c) of this section."

13cv3173

1     Plaintiffs do not address the causation issue in their opposition.  They counter

2 that they have standing to assert this claim because they have shifted the focus from

3 "privity" to "predicate acts" as the foundational legal nexus.  (Doc. No. 33 at 10.)

4 They contend also that their case is different from <u>Rivac</u> because their theory is not

5 premised on "failed and incomplete individual mortgage chain of title and transfer

6 irregularities," as in <u>Rivac</u>, but is, instead, that "fraud . . . seminal to the very legal

7 existence and validity" of the trust renders the "entire trust . . . void and

8 unenforceable, making collection on behalf of its trustee, H.S.B.C., an attempt to

9 collect an [sic] fraudulent debt in contravention of [RICO] . . . ."  (<u>Id.</u> at 1 & n.2.)

10     Several difficulties are fatal to Plaintiffs' claim.  First, it is true that RICO

11 makes it unlawful for "any person employed by or associated with any enterprise

12 engaged in . . . interstate or foreign commerce, to conduct or participate, directly

13 or indirectly, in the conduct of such enterprise's affairs through . . . *collection of*

14 *unlawful debt*."  18 U.S.C. § 1962(c) (emphasis added).  However, RICO defines

15 "unlawful debt" as the result of illegal gambling or usurious lending, which is

16 defined as lending at "at least twice the enforceable rate."  <u>Id.</u> § 1961(6).[8]  Here,

17 where Plaintiffs assert that Defendants cannot enforce the debt because of the

18 transfer to the trust, which they do not allege is related to illegal gambling or usury,

19 they have not alleged collection of an "unlawful debt" as it is defined by RICO.

20     Second, leaving that aside, the illegal acts Plaintiffs allege—mail fraud, wire

21 fraud, forgery, and money laundering to collect an unlawful debt—are all premised

22

23     [8]  18 U.S.C. § 1961(6) reads:

24 "[U]nlawful debt" means a debt (A) incurred or contracted in gambling

25 activity which was in violation of the law of the United States, a State
    or political subdivision thereof, or which is unenforceable under State

26 or Federal law in whole or in part as to principal or interest because of
    the laws relating to usury, and (B) which was incurred in connection

27 with the business of gambling in violation of the law of the United
    States, a State or political subdivision thereof, or the business of

28 lending money or a thing of value at a rate usurious under State or
    Federal law, where the usurious rate is at least twice the enforceable
    rate.

on the theory that Defendants' collection efforts were fraudulent because the trust was void under New York law.  (See, e.g., SAC ¶ 41 ("[T]he **OMAC Trust** was never funded, a sham trust, illegal and void *ab initio* under both New York Trust Laws and New York commercial laws.").)  However, Plaintiffs do not explain why New York law applies here, particularly when their deed of trust contains a choice-of-law provision that designates California law as the governing law.

Third, Plaintiffs also do not explain or offer any authority to show why, if the trust was void, their obligation under the deed of trust to continue sending payments to their loan servicer evaporated.  Such a position is contrary to California law, which holds that assignments and securitization do not change the borrower's obligations because they are separate contracts.  See, e.g., Siliga v. Mortg. Elec. Registration Sys., Inc., 219 Cal. App. 4th 75, 85 (2013) ("The assignment of the deed of trust and the note did not change the Siligas' obligations under the note . . . ."); Herrera v. Fed. Nat'l Mortg. Ass'n, 205 Cal. App. 4th 1495, 1507 (2012) ("Because a promissory note is a negotiable instrument, a borrower must anticipate it can and might be transferred to another creditor.  As to plaintiff, an assignment merely substituted one creditor for another, without changing her obligations under the note.").  Conceivably, in the case of a failed or fraudulent assignment or transfer of interests, multiple creditors might assert conflicting interests in the debt.  Here, however, Plaintiffs do not allege that more than one entity has claimed a right to collect payments or foreclose, and their cohesive account of the chain of servicers —from Provident to Opteum to Everbank to Everhome, (SAC ¶¶ 27–28)—shows that they knew who their servicer was.

Last, to have standing to sue under RICO, a person must have been "injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).  The plaintiff must "show that the racketeering activity was both a but-for cause and a proximate cause of his injury."  Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 873 (9th Cir. 2010).  "Proximate

13cv3173

1   causation for RICO purposes requires some direct relation between the injury

2   asserted and the injurious conduct alleged." Id. (internal quotation marks omitted).

3   The Supreme Court has "reiterated" that the "general tendency . . . is not to go

4   beyond the first step." Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010).

5   In the present case, Plaintiffs do not dispute that they owe money on the debt.

6   Because their theory of causation would require the court to go beyond the first

7   step—their failure to stay current on their loan payments—it "cannot meet RICO's

8   direct relationship requirement." Id.  The court, therefore, agrees with this aspect

9   of the analysis in Rivac, which Plaintiffs do not address.

10      Because additional facts will not result in a viable theory, this claim is

11   dismissed without leave to amend.

12              **ii.    Real Estate Settlement Procedures**

13      Plaintiffs allege that Defendants EverBank and HSBC violated the Real

14   Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 et seq., by failing

15   to respond to their requests for the "identity and contact information of the holder(s)

16   of the beneficial interest" of their note.  (SAC ¶ 101.)  Plaintiffs provide copies of

17   the letters, which dispute the validity of the debt and demand information and

18   copies of documents related to the trust and assignment of the mortgage.  (SAC,

19   Exhs. 10–11, 13.)

20      As the court discussed in its previous order, RESPA requires mortgage-loan

21   servicers to provide a timely written response to inquiries from borrowers regarding

22   the servicing of their loans, which are called  "qualified written requests."  See 12

23   U.S.C. § 2605(e)(1)–(2).  A servicer who fails to respond properly to such a request

24   is liable for actual damages, and, if there is a pattern or practice of noncompliance,

25   for statutory damages as well.  See id. § 2605(f).

26      EverBank and HSBC contend that this claim fails because Plaintiffs do not

27   allege how they suffered any damages because of any failure to respond.  (Doc.

28   No. 32-1 at 13.)  They cite several cases that dismissed similar claims because

the plaintiff failed to allege how the purported violation proximately caused the alleged damages.  See, e.g., Derusseau v. Bank .v Am., N.A., 2011 WL 5975821, at *4–5 (S.D. Cal. Nov. 29, 2011) ("Plaintiff's FAC fails to adequately allege she suffered damages as a result of BAC's conduct."); Frison v. WMC Mortg. Corp., 2011 WL 4571753, at *4–5 (S.D. Cal. Sept. 30, 2011) ("Conclusory and speculative allegations about the effects of failure to respond to a [qualified written request's] 'laundry list' of requests for information are insufficient.").

Plaintiffs do not address this issue in their opposition.  (See Doc. No. 33 at 23–24.)  By failing to address the issue, which was among the reasons the court dismissed this claim previously, they have waived it.  See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 802 F. Supp. 2d 1125 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.").

Moreover, the case Plaintiffs cite, Medrano v. Flagstar Bank, FSB, 704 F.3d 661 (9th Cir. 2012), also requires dismissal of this claim.  Medrano held that, under RESPA, a response to an inquiry is required only if it "seeks information relating to the servicing of the loan."  Id. at 666 (quotation marks omitted).  It explained that "servicing," as the statute defines it, "encompass[es] only receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments."  Id.  The letters at issue in Medrano challenged "only the loan's validity and terms, not its servicing," so they were not qualified written requests that gave rise to a duty to respond under § 2605(e).  Id. at 667.

Similarly, here, rather than seeking information regarding the servicing of their loan, Plaintiffs challenged the validity of the debt and demanded proof of the true holder of their note.  Accordingly, no response was required under RESPA. See, e.g., Dang v. Residential Credit Solutions, Inc., 2014 WL 5513753, at *8

1   (N.D. Cal. Oct. 31, 2014) ("The letters requested verification of the proof of claim

2   and disputed the validity of the debt, so defendants were not required to respond.").

3   Because Plaintiffs have not presented a viable legal theory, this claim is dismissed

4   without leave to amend.

5                    **iii.    Fair Debt Collection Practices**

6          Plaintiffs allege that EverBank and HSBC violated the Fair Debt Collection

7   Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., by "engag[ing] in the use of

8   false, deceptive and/or misleading representations in connection with the collection

9   of a debt including the false representation of the character, amount, and/or legal

10  status of the debt and the threat to take action that cannot be taken legally and

11  lawfully." (SAC ¶ 106.) Plaintiffs do not identify specifically what provision of

12  the FDCPA was violated.

13         EverBank and HSBC contend that this claim must be dismissed for two

14  reasons. (Doc. No. 32-1 at 14–16.) First, the claim is premised on fraud, and

15  allegations of fraud are insufficient under Federal Rule of Civil Procedure 9(b)

16  if they "lump multiple defendants together," as Plaintiffs have done in the SAC.

17  See Swartz v. KPMG LLP, 476 F.3d 756, 764–65 (9th Cir. 2007). Second, as the

18  court noted in its previous order, federal district courts throughout the Ninth Circuit

19  have concluded that nonjudicial foreclosure is not "debt collection" within the

20  meaning of the FDCPA. See, e.g., Roth v. Integrity 1st Fin., LLC, 2011 WL

21  4346382, at *2 (D. Nev. Sept. 14, 2011) ("It is well established that non judicial

22  foreclosures are not an attempt to collect a debt under the [FDCPA].").

23         Plaintiffs' only response is that "[t]he complaint alleges deceptive and

24  prohibited debt collection practices under Section 1692 of the [FDCPA]. Four

25  prohibited abusive collection practices are specifically set forth that plainly state

26  Plaintiffs' claim with particularity and specificity." (Doc. No. 33 at 24 (citations

27  to the SAC omitted).) They thus do not address either of EverBank and HSBC's

28  arguments, and, by failing to oppose them, have effectively waived them.

13cv3173

The court notes that it is under no obligation to "manufacture arguments," and that bare assertions are not enough.  See Greenwood v. F.A.A., 28 F.3d 971, 977 (9th Cir. 1994).  That is especially the case where, as in this case, a party is represented by counsel.  Because Plaintiffs did not defend against the challenges to this claim, it is dismissed without leave to amend.

### iv.    Civil Extortion

Plaintiffs allege that EverBank and HSBC are liable for extortion under 18 U.S.C. § 1951(b)(2) because they undertook to obtain money from Plaintiffs "despite having no legitimate, demonstrable, and/or documented interest" in their mortgage.  (SAC ¶ 123.)

EverBank and HSBC contend that this claim fails because, as the court discussed in its previous order, there is generally no private cause of action for extortion under federal law, and, even if there is, Plaintiffs did not plead facts to show a "wrongful use" of action, as required by § 1951(b)(2), because they have not presented any valid theories for why their debt is unenforceable.  (Doc. No. 32-1 at 18–20.)  They cite Shull v. Ocwen Loan Servicing, LLC, 2014 WL 1404877 (S.D. Cal. Apr. 10, 2014), which dismissed a similar extortion claim for these reasons. See id. at *4–5.

In their opposition, Plaintiffs do not address Shull or provide any authority to show that a private cause of action for extortion exists under federal law.  (Doc. No. 33 at 20–22.)  Their cases do address the possibility of a civil extortion claim under state law.  See Monex Deposit Co. v. Gilliam, 666 F. Supp. 2d 1135, 1137 (C.D. Cal. 2009); Leeper v. Beltrami, 53 Cal. 2d 195, 203–04 (1959).  However, as discussed below, the court does not have jurisdiction to address Plaintiffs' state-law claims.  Accordingly, this claim is also dismissed without leave to amend.

### v.    Injunctive Relief Against Default and Foreclosure

Plaintiffs assert a cause of action for injunctive relief against threatened default and foreclosure.  (SAC ¶¶ 141–43.)  Plaintiffs do not identify the specific

1   legal basis for their claim.

2       As the court noted in its previous order, injunctive relief is a remedy, not

3   an independent cause of action.  See, e.g., Hernandez v. First Am. Loanstar Trustee

4   Servs., 2010 WL 1445192, at *5 (S.D. Cal. Apr. 12, 2010).  Because Plaintiffs'

5   federal causes of action have failed and, as discussed below, the court does not have

6   jurisdiction to address the state-law claims, Plaintiffs' claim for injunctive relief is

7   dismissed as well.

8       **3.    Plaintiffs' State-Law Causes of Action**

9       Plaintiffs' remaining causes of action depend upon state law.  When the

10  federal claims that served as the basis for jurisdiction are eliminated, federal courts

11  may decline to assert supplemental jurisdiction over the remaining state-law claims.

12  See 28 U.S.C. § 1367(c)(3); Acri v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th

13  Cir. 1997) (courts may sua sponte dismiss state-law claims if federal claims are

14  dismissed).

15      Plaintiffs assert in the SAC that this court has jurisdiction pursuant to

16  28 U.S.C. §§ 1331, 1332, 1343, and 2201, as well as under 12 U.S.C. § 2605

17  (RESPA), 15 U.S.C. § 1692 (the FDCPA), and 42 U.S.C. § 1983.  (SAC ¶ 18.)

18      However, none of these statutes provides a basis for jurisdiction over the

19  remaining claims.  There is no basis for "arising under" jurisdiction under 28 U.S.C.

20  § 1331 because Plaintiffs' federal claims fail, including those under RESPA and

21  the FDCPA.  Plaintiffs did not assert any claim under 42 U.S.C. § 1983.  There is

22  no basis for diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiffs are

23  California residents and Defendant MTC is a California corporation headquartered

24  in California.  (SAC ¶ 18.)  28 U.S.C. § 1343 confers jurisdiction only where the

25  plaintiff has stated a viable federal civil-rights claim, which is not the case here.

26  See Deleo v. Rudin, 328 F. Supp. 2d 1106, 1114 (D. Nev. 2004) ("[T]he Court does

27  not have jurisdiction under § 1343 unless the plaintiff has stated a non-frivolous

28  claim under one of the substantive statutes to which this section refers."); Stanislaus

1  Food Prods. Co. v. Pub. Utils. Comm'n, 560 F. Supp. 114, 118 (N.D. Cal. 1982)

2  ("Jurisdiction has not been established under 42 U.S.C. § 1983 and cannot,

3  therefore, be based on 28 U.S.C. § 1343."). And, finally, the Declaratory Judgment

4  Act, 28 U.S.C. § 2201, only expands the remedies available in federal court; it does

5  not confer jurisdiction where it does not otherwise exist. See Shell Gulf of Mexico,

6  Inc. v. Ctr. for Biological Diversity, Inc., 771 F.3d 632, 635 (9th Cir. 2014).

7  Moreover, Plaintiffs do not assert a cause of action for declaratory judgment.

8       Because Plaintiffs have not asserted any viable federal claims and have

9  not identified any other basis for federal jurisdiction, the court declines to exercise

10  supplemental jurisdiction over the remaining state-law claims. These claims, like

11  the federal claims, are dismissed without leave to amend.

**CONCLUSION**

13       The court GRANTS Defendants' motions to dismiss, (Doc. Nos. 30 & 33).

14  Accordingly, Plaintiffs' second amended complaint is DISMISSED in its entirety,

15  without leave to amend. The Clerk of Court is instructed to close the file.

16       IT IS SO ORDERED.

17  DATED: April 14, 2015

18  _____
    Hon. Jeffrey T. Miller
19  United States District Judge